# Exhibit 1

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts The Superior Court |
|---|---|---|

**PLAINTIFF(S):** THE SUNSHINE LADY FOUNDATION, INC.
**ADDRESS:** 103 S 11th St. B, Moorehead City, North Carolina, 28557

**COUNTY**

**DEFENDANT(S):** ALEXANDER ROZEK, as Trustee of the Doris Buffett Revocable Trust

**ATTORNEY:** Mark E. Swirbalus, Esq. / Rebecca Harris, Esq.
**ADDRESS:** Goulston & Storrs PC
400 Atlantic Avenue, Boston, MA 02110

**ADDRESS:** 7 Fairfield St., Apt. 1, Boston, Massachusetts, 02116

**BBO:** MES: 631650/ RH: 699598

**TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| D13 | Equitable Remedies | A | ☐ YES   ☒ NO |

*If "Other" please describe:

Is there a claim under G.L. c. 93A? ☐ YES ☒ NO
Is this a class action under Mass. R. Civ. P. 23? ☐ YES ☒ NO

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(attach additional sheets as necessary)

A. Documented medical expenses to date:
 1. Total hospital expenses ............... $_____
 2. Total doctor expenses ............... $_____
 3. Total chiropractic expenses ............... $_____
 4. Total physical therapy expenses ............... $_____
 5. Total other expenses (describe below) ............... $_____
  **Subtotal (A):** $_____

B. Documented lost wages and compensation to date ............... $_____
C. Documented property damages to date ............... $_____
D. Reasonably anticipated future medical and hospital expenses ............... $_____
E. Reasonably anticipated lost wages ............... $_____
F. Other documented items of damages (describe below) ............... $_____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

**TOTAL (A-F):** $_____

**CONTRACT CLAIMS**
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):
**TOTAL:** $_____

**Signature of Attorney/ Unrepresented Plaintiff:** X  *[signature]*   **Date:** 11/4/2020

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

**Signature of Attorney of Record:** X  *[signature]*   **Date:** 11/4/2020

## CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

**AC Actions Involving the State/Municipality ***

- AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. (A)
- AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. (A)
- AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. (A)
- AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. (A)
- AE1 Administrative Action involving Commonwealth, Municipality, MBTA, etc. (A)

**CN Contract/Business Cases**

- A01 Services, Labor, and Materials (F)
- A02 Goods Sold and Delivered (F)
- A03 Commercial Paper (F)
- A04 Employment Contract (F)
- A05 Consumer Revolving Credit - M.R.C.P. 8.1 (F)
- A06 Insurance Contract (F)
- A08 Sale or Lease of Real Estate (F)
- A12 Construction Dispute (A)
- A14 Interpleader (F)
- BA1 Governance, Conduct, Internal Affairs of Entities (A)
- BA3 Liability of Shareholders, Directors, Officers, Partners, etc. (A)
- BB1 Shareholder Derivative (A)
- BB2 Securities Transactions (A)
- BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. (A)
- BD1 Intellectual Property (A)
- BD2 Proprietary Information or Trade Secrets (A)
- BG1 Financial Institutions/Funds (A)
- BH1 Violation of Antitrust or Trade Regulation Laws (A)
- A99 Other Contract/Business Action - Specify (F)

\* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

† Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

**ER Equitable Remedies**

- D01 Specific Performance of a Contract (A)
- D02 Reach and Apply (F)
- D03 Injunction (F)
- D04 Reform/ Cancel Instrument (F)
- D05 Equitable Replevin (F)
- D06 Contribution or Indemnification (F)
- D07 Imposition of a Trust (A)
- D08 Minority Shareholder's Suit (A)
- D09 Interference in Contractual Relationship (F)
- D10 Accounting (A)
- D11 Enforcement of Restrictive Covenant (F)
- D12 Dissolution of a Partnership (F)
- D13 Declaratory Judgment, G.L. c. 231A (A)
- D14 Dissolution of a Corporation (F)
- D99 Other Equity Action (F)

**PA Civil Actions Involving Incarcerated Party †**

- PA1 Contract Action involving an Incarcerated Party (A)
- PB1 Tortious Action involving an Incarcerated Party (A)
- PC1 Real Property Action involving an Incarcerated Party (F)
- PD1 Equity Action involving an Incarcerated Party (F)
- PE1 Administrative Action involving an Incarcerated Party (F)

**TR Torts**

- B03 Motor Vehicle Negligence - Personal Injury/Property Damage (F)
- B04 Other Negligence - Personal Injury/Property Damage (F)
- B05 Products Liability (A)
- B06 Malpractice - Medical (A)
- B07 Malpractice - Other (A)
- B08 Wrongful Death - Non-medical (A)
- B15 Defamation (A)
- B19 Asbestos (A)
- B20 Personal Injury - Slip & Fall (F)
- B21 Environmental (F)
- B22 Employment Discrimination (F)
- BE1 Fraud, Business Torts, etc. (A)
- B99 Other Tortious Action (F)

**RP Summary Process (Real Property)**

- S01 Summary Process - Residential (X)
- S02 Summary Process - Commercial/ Non-residential (F)

**RP Real Property**

- C01 Land Taking (F)
- C02 Zoning Appeal, G.L. c. 40A (F)
- C03 Dispute Concerning Title (F)
- C04 Foreclosure of a Mortgage (X)
- C05 Condominium Lien & Charges (X)
- C99 Other Real Property Action (F)

**MC Miscellaneous Civil Actions**

- E18 Foreign Discovery Proceeding (X)
- E97 Prisoner Habeas Corpus (X)
- E22 Lottery Assignment, G.L. c. 10, § 28 (X)

**AB Abuse/Harassment Prevention**

- E15 Abuse Prevention Petition, G.L. c. 209A (X)
- E21 Protection from Harassment, G.L. c. 258E (X)

**AA Administrative Civil Actions**

- E02 Appeal from Administrative Agency, G.L. c. 30A (X)
- E03 Certiorari Action, G.L. c. 249, § 4 (X)
- E05 Confirmation of Arbitration Awards (X)
- E06 Mass Antitrust Act, G.L. c. 93, § 9 (A)
- E07 Mass Antitrust Act, G.L. c. 93, § 8 (X)
- E08 Appointment of a Receiver (X)
- E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A (A)
- E10 Summary Process Appeal (X)
- E11 Worker's Compensation (X)
- E16 Auto Surcharge Appeal (X)
- E17 Civil Rights Act, G.L. c.12, § 11H (A)
- E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) (X)
- E25 Pleural Registry (Asbestos cases)
- E94 Forfeiture, G.L. c. 265, § 56 (X)
- E95 Forfeiture, G.L. c. 94C, § 47 (F)
- E99 Other Administrative Action (X)
- Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B (F)
- Z02 Appeal Bond Denial (X)

**SO Sex Offender Review**

- E12 SDP Commitment, G.L. c. 123A, § 12 (X)
- E14 SDP Petition, G.L. c. 123A, § 9(b) (X)

**RC Restricted Civil Actions**

- E19 Sex Offender Registry, G.L. c. 6, § 178M (X)
- E27 Minor Seeking Consent, G.L. c.112, § 12S (X)

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | __F__ | [x] YES   [ ] NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF -** The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT -** If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

## A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
## MAY RESULT IN DISMISSAL OF THIS ACTION.



THE COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                    SUPERIOR COURT DEPARTMENT
                                               OF THE TRIAL COURT
                                               CIVIL ACTION NO.

THE SUNSHINE LADY FOUNDATION, INC.,

  *Plaintiff*,

v.

ALEXANDER ROZEK, as Trustee of the Doris Buffett Revocable Trust,

  *Defendant*.



## COMPLAINT

This is an action to determine The Sunshine Lady Foundation's interest and rights in the trust created by the philanthropist Doris Buffett, a/k/a the "Sunshine Lady," who founded The Sunshine Lady Foundation more than twenty years ago. Ms. Buffett said publicly that she wanted her "last check to bounce," but she also made clear to those closest to her that she wanted her charitable work to continue after her death through her foundation—The Sunshine Lady Foundation. Sadly, Ms. Buffett passed away on August 4, 2020.

## PARTIES

1. The Sunshine Lady Foundation, Inc. ("SLF") is a charitable organization located in Morehead City, North Carolina.

2. Alexander Rozek ("Alexander") is trustee of the Doris Buffett Revocable Trust (the "Trust"), on information and belief, and he is one of Ms. Buffett's grandchildren. On further information and belief, he resides and administers the Trust in Boston, Massachusetts.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to G.L. c. 212, § 4 and G.L. c. 231A, § 1, and personal jurisdiction pursuant to G.L. c. 223A, §§ 2-3.

4. Venue is proper in this county pursuant to G.L. c. 223, § 1.

## BACKGROUND

### Ms. Buffett Creates The Sunshine Lady Foundation

5. Ms. Buffett founded SLF in 1996.

6. Ms. Buffett was known as the "Sunshine Lady" because of her kindness and generosity. Naturally, SLF was driven by these same values. Its purpose was and is to improve the lives of disadvantaged people, especially those whose disadvantage is overlooked by other philanthropists.

7. Three of Ms. Buffett's closest friends—Anne "Mitty" Ewing Beal ("Mitty"), Diane Grimsley ("Diane"), and Rebecca Currie ("Rebecca")—have been involved with SLF from its start. Mitty, Diane, and Rebecca continue to serve on SLF's Board of Directors.

8. While Ms. Buffett's relationships with her own children and grandchildren were difficult, she was extremely close to Mitty, Diane, and Rebecca. They are non-family friends and colleagues whom Ms. Buffett relied upon and entrusted with helping to drive and fulfill SLF's mission. It is commonly known that Ms. Buffett and her children and grandchildren experienced long periods of estrangement and distrust.

9. Due to the dedication, energy, and personal approach of Mitty, Diane, Rebecca, and a network of other non-family friends and volunteers called the "Sunbeams," SLF emulated Ms. Buffett herself. An article published in 1999 in *Worth* magazine aptly described SLF as

"uniquely hands-on, folksy, a person-to-person enterprise—the 'un-foundation.'" SLF remains the same today. It is not a "corporate" foundation.

10. In the summer of 2006, Ms. Buffett's younger brother, Warren Buffett, announced his intention to donate most of his fortune to the Bill Gates Foundation. Following this announcement, Mr. Buffett received an overwhelming volume of letters from individuals requesting funds to meet particular needs. He turned to his sister for help, and she enlisted SLF, which reviewed and responded to the many requests in the same "person-to-person" manner that had become SLF's hallmark and had caused Ms. Buffett to become known as the "retail" philanthropist who helps those in need on a one-on-one basis. Responding to these letters became known as the "Warren's Letters" program. The Warren's Letters program was funded by Warren Buffett himself and was operated by SLF until 2016.

11. As Mr. Buffett would later write in the preface to Ms. Buffett's book: "My sister, Doris, is a philanthropist, but far from an ordinary one. Some people write a large number of checks; others invest a large amount of time and effort. Doris does both. She's smart about how she does it as well, combining a soft heart with a hard head."

### Ms. Buffett Intends to Benefit SLF in Her Trust

12. Rather than leave money to family, it was always Ms. Buffett's publicly-stated intention to give all of her money away during her lifetime, through SLF, to help disadvantaged people. In the event she were unable to give all of her money away during her lifetime, however, Ms. Buffett intended that whatever money remained upon her death would go to SLF to continue her charitable work. Ms. Buffett legally memorialized this intention in her trust, the Doris Buffett Revocable Trust.

13. Ms. Buffett named SLF as the primary beneficiary of the Trust after her death, and named Mitty to serve as a successor trustee of the Trust.

14. On December 1, 2014, when Ms. Buffett spoke with her estate-planning lawyer in her hometown of Fredericksburg, Virginia—R. Leigh Frackelton, Jr.—she again confirmed her desire that SLF receive the bulk of her remaining assets after her death and that Mitty serve as a successor trustee of the Trust.

15. On information and belief, when Ms. Buffett later signed a Tenth Amendment of the Trust prepared by Attorney Frackelton, SLF continued to be named as the primary beneficiary of the Trust after Ms. Buffett's death, and Mitty continued to be named to serve as a successor trustee of the Trust.

16. Over the years, Ms. Buffett repeatedly told Mitty, Diane, Rebecca, and many others that SLF was and would be the primary beneficiary of the Trust after her death. She never wavered from this commitment. To the extent any funds remained, she wanted her charitable work to be completed after her death through SLF, the foundation she had created and run for twenty years with her close friends. Due to various strains and estrangements with her children and grandchildren over many decades, Ms. Buffett relied heavily upon her close friends to help formulate and execute her charitable goals.

### As Ms. Buffett's Health Deteriorates, She is Isolated from SLF

17. On October 4, 2012, Ms. Buffett signed a Durable Power of Attorney naming her grandson Alexander as her attorney-in-fact.

18. In 2015, as Ms. Buffett's health deteriorated, Alexander moved her to Boston, where he resided, and where she could receive top-flight medical treatment. He took control of her financial, medical, and legal decisions as her fiduciary under the Durable Power of Attorney.

19. Among Ms. Buffett's health problems was advanced dementia. In April 2016, she began treatment with Dr. Nancy J. Donovan, a geriatric psychiatrist and neurologist affiliated with the Center for Alzheimer Research and Treatment at Brigham & Women's Hospital in Boston.

20. Over the next several months, Ms. Buffett became increasingly disoriented and confused. As her personal assistant reported in an email dated July 7, 2016:

> Doris dressed in three pairs of undies a few days ago, and pants on backwards. She tried to brush her teeth with deodorant one day—that was bad. She put toothpaste on her nails and called me for help because her nail polish wasn't working …. She tries to get into other people's cars. She walks into traffic. She opens the car door to get out, closes it, and sits there. That's the state of her mind right now ….
>
> She will sound very together and adamant on the phone but what she is saying is so often so far from the truth, a version of a story her mind revised.

21. In the same email, Ms. Buffett's personal assistant pleaded for help for Ms. Buffett: "ANY CHOICE IS MENTAL TORTURE TO HER. Does everyone understand that? Her Geriatric counsellors have told us over and over again that choice unwinds her and that her life—given her mental state—needs to be simplified."

22. At about the same time, in July 2016, Alexander initiated contact with Sacha Pfeiffer, a reporter with *The Boston Globe*, about interviewing Ms. Buffett for an article that would publicly announce the relocation of the Warren's Letters program to Boston and solicit volunteers in the Boston area to help with the relocated program.

23. Although Alexander was a member of SLF's Board of Directors, he did not notify his fellow members of the Board—Mitty, Diane, and Rebecca—of his plan to relocate the Warren's Letters program to Boston or the action he was taking to that end. For example, as Alexander later informed Mitty as part of an email exchange on August 15, 2016, after the

publication of the article in *The Boston Globe*, he had already secured a UPS box in Boston to receive the letters, and he had already set up a database into which the received letters could be scanned.

24. Thereafter, Ms. Buffett became increasingly agitated by the amount of incoming mail and the number of volunteers wanting to meet her and help with the Warren's Letters program, which Alexander was now effectively operating in Boston, and Ms. Buffett repeatedly called her friends to express her unhappiness about being permanently relocated to Boston.

25. As Ms. Buffett continued to deteriorate, Alexander began isolating her from SLF and from Mitty, Diane, and Rebecca, who were her closest friends and fellow members of SLF's Board of Directors.

26. Mitty, Diane, and Rebecca worried that the pressure of relocating the Warren's Letters program to Boston would exacerbate Ms. Buffett's mental decline. Alexander explained, however, that administering the program in Boston would help to keep Ms. Buffett "intellectually active," as one of her doctors had recommended a year earlier. Therefore, with great concern for Ms. Buffett's well-being, SLF agreed that if her doctors considered the relocation of the program to Boston to be positive for Ms. Buffett, then SLF would not interfere.

27. Ms. Buffett continued to deteriorate, and on August 30, 2016, she was admitted to McLean Hospital for a psychiatric episode.

28. On September 1, 2016, Alexander and several other family members sent a letter to Ms. Buffett's friends and associates—including Mitty, Diane, and Rebecca—instructing them to refrain from discussing finances, her residences, or SLF projects with Ms. Buffett. All such communications with Ms. Buffett were to be directed to Alexander, who held her General Power

of Attorney and Advance Medical Directive, and who had inserted himself as the gatekeeper between Ms. Buffett and her friends.

29. At about the same time, in early September 2016, all of the letters received by SLF during the ten years of SLF's operation of the Warren's Letters program (approximately 22,000 letters) were unlawfully removed—without permission from SLF and without notice to SLF—from a locked storage unit in Rockport, Maine and taken to Boston.

### SLF's Discontinued Operation of the Warren's Letters Program

30. Given all that had transpired since the article in *The Boston Globe* and culminating in Ms. Buffett's hospitalization, Mitty, Diane, and Rebecca decided to end SLF's operation of the Warren's Letters program, in part because they could not be responsible fiduciaries for a program over which they no longer had any control or input, and in part because they continued to be worried about the program's impact on Ms. Buffett's decline. As Mitty explained in an email to Warren Buffett on September 7, 2017:

> I'm emailing you to inform you that the majority of the Sunshine Lady Foundation board members, in consultation with our legal advisor, have made the difficult decision to discontinue the Sunshine Lady "Warren's letters" program for reasons given below. This decision was made after a cascade of events beginning with the Boston Globe article on August 13th, followed by Doris' hospitalization on August 29th, and finally the receipt of a letter sent from Doris' family via her lawyer on Sept 1st, asking friends and associates to refrain from appealing directly to her to influence decisions about her residence, travel schedule, foundation projects, and finances.... We feel it is only right that you should make the decision about how to proceed with the "Warren's letters" program going forward. Given our grave concern about Doris' health, and the fact that we are not privy to the nature or extent of her health crisis, we do not feel it is within our purview, as friends, employees or SLF board members, to make a recommendation as to next steps. We are confident that your involvement at this juncture will give Doris peace of mind. Alexander will contact you directly to present his plan for how to proceed.

7

31.     On September 21, 2016, SLF held a pre-planned special meeting of its Board of Directors to vote to discontinue SLF's operation of the Warren's Letters program. Alexander attended the special meeting and abstained from voting, and Ms. Buffett did not attend.

32.     Thereafter, Alexander used SLF's discontinuation of its operation of the Warren's Letters program as a reason to attack SLF on Ms. Buffett's behalf, and to drive a wedge between Ms. Buffett and SLF.

33.     By letter dated October 13, 2016, SLF was informed by Thacher Associates, which identified itself as "an advisor for Doris Buffett's family," that it would be conducting a forensic accounting of SLF's records due to SLF's "closing" the Warren's Letters program.

34.     By letter dated October 21, 2016, a law firm in Boston that had begun to represent both Alexander and Ms. Buffett (Alexander was now in full control of Ms. Buffett's legal affairs—she no longer had her own independent counsel) informed SLF that Alexander and Ms. Buffett engaged the Boston law firm to "assist them with charitable and personal matters" and demanded SLF's compliance with the "in-depth investigatory audit of the Foundation" that Alexander and Ms. Buffett had ordered. In truth, on information and belief, Ms. Buffett was not involved in making this decision.

35.     On October 24, 2016, SLF's Board of Directors voted unanimously to appoint a nationally recognized auditor, RSM US LLC ("RSM"), to complete its own audit of SLF. Alexander insisted, however, that in addition to RSM's audit, he would still pursue the forensic accounting of SLF through Thacher Associates.

36.     By letter dated November 23, 2016, the Boston law firm representing both Alexander and Ms. Buffett wrote that their decision to seek a forensic accounting of SLF "arose from their concern about financial controls at the Foundation and the possibility of self-dealing

by other directors, in particular Anne Beal [Mitty] ...." In truth, on information and belief, Ms. Buffett did not share this concern, which was later proven by the RSM audit to be unfounded.

37. The results of the audit by Thacher Associates were never revealed to SLF's Board of Directors, despite Alexander's previous insistence that he was entitled, as a member of the Board, to order the audit.

38. Meanwhile, Alexander continued to isolate Ms. Buffett from Mitty, Diane, and Rebecca, who had not been permitted to see or speak with Ms. Buffett—their close friend and SLF's President—since her collapse months earlier in August 2016.

39. Ms. Buffett had not participated in any meetings of SLF's Board of Directors during this period of her isolation, prompting Diane to write the following in a letter to Ms. Buffett on February 3, 2017:

> Dear Doris,
>
> First and foremost, I want you to know how extremely painful it has been for Rebecca, Mitty and me to have experienced your absence from our daily lives for the past five months. You are so much more to each of us than the founder and president of the Sunshine Lady Foundation. We all think of you constantly and would like to know how you are and when we can hope to hear from you again.
>
> As acting board president I am compelled to write to you on behalf of the Sunshine Lady Foundation board to inform you that you have missed three consecutive board meetings. In accordance with our Bylaws, Section 3.9 of Section 3: Meetings of Directors, I am now sending you notice advising you that you may be removed from the Board of Directors in the event of a fourth consecutive absence from a meeting. I would have called you, as our bylaws dictate, after you missed two consecutive meetings, but according to the letter we received last September 1st from your family, we were asked to refrain from any contact with you and we have honored that request.
>
> If you feel, given the advice of your medical team, that now is the time to consider retiring as president and director of the foundation, we will of course accept your decision with tremendous sadness in our hearts. An alternative to considering retirement would be the creation of an honorary

9

director status for you which process I will initiate with the board at your request.

I am so sorry that I am now in the position to have to perform this duty.

With great love,

Diane Grimsley
Board Vice President and Treasurer

40. As of the date of this letter, because Ms. Buffett had been isolated from them, Mitty, Diane, and Rebecca were not aware of the extent of Ms. Buffett's decline, which had been steep, and they were not aware of her incapacity to participate on SLF's Board of Directors or to manage her personal and financial affairs.

41. By letter dated February 14, 2017, the Boston law firm representing both Alexander and Ms. Buffett responded to Diane's letter, mischaracterizing it as a "threat to remove Doris from the Board …."

42. Thereafter, Ms. Buffett's isolation from SLF and her friends on SLF's Board of Directors continued, and the tension between Alexander and SLF continued to increase, leading to a Settlement and Release Agreement dated December 11, 2017.

43. The purpose of the Settlement and Release Agreement was to memorialize Ms. Buffett's and Alexander's respective resignations from SLF's Board of Directors, and the transition of the Warren's Letters program from SLF to the new charitable entity in Boston that Alexander had created—the Sunshine Lady Humanitarian Grants Program, Inc.

44. Alexander signed the Settlement and Release on Ms. Buffett's behalf as her attorney-in-fact. Ms. Buffett did not sign for herself. On information and belief, Ms. Buffett was not competent to sign for herself.

## Ms. Buffett's Final Years

45.     Mitty, Diane, and Rebecca continued to be blocked from seeing or speaking with their close friend Ms. Buffett during the final years of her life. Whatever news they learned about Ms. Buffett came from others.

46.     On May 5, 2018, *The Boston Globe* published a second article by Sacha Pfeiffer. According to this article, Ms. Buffett was suffering from "advanced Alzheimer's disease" since being relocated to Boston in 2015; Ms. Buffett has "severe dementia" and, according to a caretaker, it would be "hard for her to put a sentence together now[;]" her family had limited her visitors, causing close friends to feel "shut out and worried about her welfare[;]" and the new charitable entity created by Alexander—which was funded with Ms. Buffett's wealth, estimated at $50 million in Berkshire Hathaway stock in September 2016—was spending lavishly on "everything from six-figure salaries to $200-an-hour 'leadership coaches' in the name of a woman known for her Midwestern thrift."

47.     The May 2018 article in *The Boston Globe* further reported that Mitty continued to be "a co-trustee, with [Alexander] Rozek, of Ms. Buffett's will [the Trust]." As of the date of the article, on information and belief, SLF continued to be the primary beneficiary of the Trust after Ms. Buffett's death. Indeed, Mitty was never informed that she had been removed as a successor trustee of the Trust, and SLF was never informed that it had been removed as the primary beneficiary of the Trust after Ms. Buffett's death.

48.     Ms. Buffett passed away on August 4, 2020.

49.     Following Ms. Buffett's death, in response to SLF's inquiry, the Boston law firm that had represented both Alexander and Ms. Buffett informed SLF that it was not a beneficiary of the Trust and that Mitty was not a successor trustee of the Trust.

11

50. SLF's request for further information—including copies of the trust documents and the date when SLF was purportedly removed as a beneficiary of the Trust and Mitty was purportedly removed as a successor trustee—was refused.[1] Instead, the individual "non-family" members of SLF's Board of Directors were threatened with claims of personal liability and damages if SLF were to pursue its interest in the Trust.

51. Moreover, despite the fact that Ms. Buffett's Last Will and Testament names Mitty as a co-personal representative of Ms. Buffett's estate, Mitty was threatened with litigation if she were to seek her appointment as a co-personal representative and "attempt to pry into the private affairs of Ms. Buffett's family." Alexander insisted on being appointed as the sole personal representative of Ms. Buffett's estate, even though that is not what Ms. Buffett had wanted.

52. Ms. Buffett wanted to ensure the continuation of her charitable work through SLF after her death. To that end, she named SLF as the primary beneficiary of the Trust after her death, and she named Mitty to serve as a successor trustee of the Trust and co-personal representative of her estate to oversee their proper administration. Ms. Buffett confirmed this intention as recently as January 15, 2016 in the Codicil to her Last Will and Testament. On information and belief, Ms. Buffet's intention will be further confirmed by the documents and information that Alexander has worked to conceal from SLF.

## COUNT I
**(Declaratory Judgment)**

53. SLF re-alleges and incorporates herein all of the preceding paragraphs.

54. Actual controversies exist as to SLF's interest and rights in the Trust. These

---

[1] SLF reserves the right to amend the Complaint based on documents and information that SLF may receive through the litigation of this action.

controversies are appropriate for declaratory relief pursuant to G.L. c. 231A, § 1.

55. More specifically, actual controversies exist as to (a) whether SLF is a beneficiary of the Trust; and (b) to the extent the Trust was amended to remove SLF as a beneficiary, whether any such amendment was legally ineffective because Ms. Buffett lacked testamentary capacity, or because the amendment was the result of undue influence or tortious interference with SLF's expectancy.

56. SLF seeks a declaration that it is a beneficiary of the Trust with all rights attendant to its beneficial interest.

## PRAYER FOR RELIEF

WHEREFORE, The Sunshine Lady Foundation, Inc. respectfully prays that the Court issue a declaration in favor of SLF as requested in Count I, and grant such other and further relief for SLF as is deemed just and appropriate under the circumstances.

THE SUNSHINE LADY FOUNDATION, INC.

By its counsel,

*/s/ Mark E. Swirbalus*

Mark E. Swirbalus (BBO No. 631650)
Rebecca Harris (BBO No. 699598)
GOULSTON & STORRS PC
400 Atlantic Avenue
Boston, Massachusetts 02110
(617) 482-1776
mswirbalus@goulstonstorrs.com
rharris@goulstonstorrs.com

Dated: November 4, 2020