# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE SUNSHINE LADY FOUNDATION, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> ALEXANDER ROZEK, Individually and as Trustee of the Doris Buffett Revocable Trust; and THE OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, PUBLIC CHARITIES DIVISION, <br><br> *Defendants*. | Civil Action No. <u>20-12146 (LTS)</u> |

## AMENDED COMPLAINT

This is an action to enforce The Sunshine Lady Foundation's interest and rights in the trust created by the philanthropist Doris Buffett, a/k/a the "Sunshine Lady," who founded The Sunshine Lady Foundation more than twenty years ago. Ms. Buffett said publicly that she wanted her "last check to bounce," but she also made clear to those closest to her that she wanted her charitable work to continue after her death through her foundation—The Sunshine Lady Foundation. Sadly, Ms. Buffett passed away on August 4, 2020.

Prior to her death, beginning less than ten days after Ms. Buffett suffered a psychiatric break requiring hospitalization and while she was suffering from advanced dementia and under the control of her grandson Alexander Rozek, *he* amended her trust to name *himself* as the sole successor trustee and to name *his* foundation as the sole remainder beneficiary after her death, thereby purportedly reducing and then eliminating The Sunshine Lady Foundation's interest as a beneficiary and subverting Ms. Buffett's clear intent. This action asserts claims that Ms. Buffett lacked testamentary capacity to amend her trust and that the amendments were the product of

undue influence and tortious interference with The Sunshine Lady Foundation's expectancy, and seeks a declaration regarding its interest and rights in the trust.

## PARTIES

1. The Sunshine Lady Foundation, Inc. ("SLF") is a charitable organization located in Morehead City, North Carolina.

2. Alexander Rozek ("Alexander") is one of Ms. Buffett's grandchildren. On information and belief, Alexander resided at all relevant times in Boston, Massachusetts, now resides in Vermont, and is now the sole trustee of the Doris Buffett Revocable Trust (the "Trust").

3. The Office of the Attorney General of Massachusetts, Public Charities Division, located at One Ashburton Place, Boston, Massachusetts, is named as a defendant pursuant to M.G.L. c. 12, § 8G.

## BACKGROUND

### Ms. Buffett Creates The Sunshine Lady Foundation

4. Ms. Buffett founded SLF in 1996.

5. Ms. Buffett was known as the "Sunshine Lady" because of her kindness and generosity. Naturally, SLF was driven by these same values. Its purpose was and is to improve the lives of disadvantaged people, especially those whose disadvantage is overlooked by other philanthropists.

6. Three of Ms. Buffett's closest friends—Anne "Mitty" Ewing Beal ("Mitty"), Diane Grimsley ("Diane"), and Rebecca Currie ("Rebecca")—have been involved with SLF from its start. Mitty, Diane, and Rebecca continue to serve on SLF's Board of Directors.

7. While Ms. Buffett's relationships with her own children and grandchildren were difficult, she was extremely close to Mitty, Diane, and Rebecca. They are non-family friends and colleagues whom Ms. Buffett relied upon and entrusted with helping to drive and fulfill SLF's mission. It is commonly known that Ms. Buffett and her children and grandchildren experienced various and often extended periods of estrangement and distrust.

8. Due to the dedication, energy, and personal approach of Mitty, Diane, Rebecca, and a network of other non-family friends and volunteers called the "Sunbeams," SLF emulated Ms. Buffett herself. An article published in 1999 in *Worth* magazine aptly described SLF as "uniquely hands-on, folksy, a person-to-person enterprise—the 'un-foundation.'" SLF remains the same today. It is not a "corporate" foundation.

9. In the summer of 2006, Ms. Buffett's younger brother, Warren Buffett, announced his intention to donate most of his fortune to the Bill Gates Foundation. Following this announcement, Mr. Buffett received an overwhelming volume of letters from individuals requesting funds to meet particular needs. He turned to his sister for help, and she enlisted SLF, which reviewed and responded to the many requests in the same "person-to-person" manner that had become SLF's hallmark and had caused Ms. Buffett to become known as the "retail" philanthropist who helps those in need on a one-on-one basis. Responding to these letters became known as the "Warren's Letters" program. The Warren's Letters program was funded by Warren Buffett himself and was operated by SLF until 2016.

10. As Mr. Buffett would later write in the preface to Ms. Buffett's book: "My sister, Doris, is a philanthropist, but far from an ordinary one. Some people write a large number of checks; others invest a large amount of time and effort. Doris does both. She's smart about how she does it as well, combining a soft heart with a hard head."

3

### Ms. Buffett Intends to Benefit SLF in Her Trust

11. Rather than leave money to family, it was always Ms. Buffett's publicly-stated intention to give all of her money away during her lifetime, primarily through SLF, to help disadvantaged people. In the event she were unable to give all of her money away during her lifetime, however, Ms. Buffett intended that whatever money remained upon her death would go to SLF to continue her charitable work. Ms. Buffett legally memorialized this intention in her trust, the Doris Buffett Revocable Trust.

12. Ms. Buffett named SLF as the primary beneficiary of the Trust after her death, and named Mitty to serve as a successor trustee of the Trust.

13. On December 1, 2014, when Ms. Buffett spoke with her estate-planning lawyer in her hometown of Fredericksburg, Virginia—R. Leigh Frackelton, Jr.—she again confirmed her desire that SLF receive the bulk of her remaining assets after her death and that Mitty serve as a successor trustee of the Trust. A memorandum of the meeting between Ms. Buffett and Attorney Frackelton memorialized SLF's beneficial interest in the trust: "As currently stated the remainder of the trust will be given to SLF."

14. On information and belief, on January 15, 2016, when Ms. Buffett signed the Tenth Amendment of the Trust prepared by Attorney Frackelton, SLF continued to be named as the primary beneficiary of the Trust after Ms. Buffett's death, and Mitty continued to be named to serve as a successor trustee of the Trust.

15. On information and belief, the Tenth Amendment was the last amendment of the Trust that Ms. Buffett would ever sign, and it was the last amendment of the Trust that would be prepared for Ms. Buffett by her own independent legal counsel.

4

16.     Over the years, Ms. Buffett repeatedly told Mitty, Diane, Rebecca, and many others that SLF was and would be the primary beneficiary of the Trust after her death. She never wavered from this commitment, and never signed any document withdrawing this commitment. To the extent any funds remained, she wanted her charitable work to be completed after her death through SLF, the foundation she had created and run for twenty years with her close friends. Due to various strains and estrangements with her children and grandchildren over many decades, Ms. Buffett relied heavily upon her close friends to help formulate and execute her charitable goals.

### As Ms. Buffett's Health Deteriorates, She is Isolated from SLF

17.     On October 4, 2012, Ms. Buffett signed a General Power of Attorney naming her grandson Alexander as her attorney-in-fact.

18.     In 2015, as Ms. Buffett's health deteriorated, Alexander moved her to Boston, where he resided, and where she could receive top-flight medical treatment. He took control of her financial, medical, and legal decisions as her fiduciary under the General Power of Attorney.

19.     Among Ms. Buffett's health problems was advanced dementia. In April 2016, subsequent to her execution of the Tenth Amendment of the Trust, she began treatment with Dr. Nancy J. Donovan, a geriatric psychiatrist and neurologist affiliated with the Center for Alzheimer Research and Treatment at Brigham & Women's Hospital in Boston.

20.     Over the next several months, Ms. Buffett became increasingly disoriented and confused. As her personal assistant reported in an email dated July 7, 2016:

> Doris dressed in three pairs of undies a few days ago, and pants on backwards. She tried to brush her teeth with deodorant one day—that was bad. She put toothpaste on her nails and called me for help because her nail polish wasn't working …. She tries to get into other people's cars. She walks into traffic. She opens the car door to get out, closes it, and sits there. That's the state of her mind right now ….

5

>She will sound very together and adamant on the phone but what she is saying is so often so far from the truth, a version of a story her mind revised.

21. In the same email, Ms. Buffett's personal assistant pleaded for help for Ms. Buffett: "ANY CHOICE IS MENTAL TORTURE TO HER. Does everyone understand that? Her Geriatric counsellors have told us over and over again that choice unwinds her and that her life—given her mental state—needs to be simplified."

22. At about the same time, in July 2016, Alexander initiated contact with Sacha Pfeiffer, a reporter with *The Boston Globe*, about interviewing Ms. Buffett for an article that would publicly announce the relocation of the Warren's Letters program to Boston and solicit volunteers in the Boston area to help with the relocated program.

23. Although Alexander was a member of SLF's Board of Directors, he did not notify his fellow members of the Board—Mitty, Diane, and Rebecca—of his plan to relocate the Warren's Letters program to Boston or the action he was taking to that end, including the publicity that he had arranged in *The Boston Globe*. For example, as Alexander later informed Mitty as part of an email exchange on August 15, 2016, after the publication of the article in *The Boston Globe*, he had already secured a UPS box in Boston to receive the letters, and he had already set up a database into which the received letters could be scanned.

24. Thereafter, Ms. Buffett became increasingly agitated by the amount of incoming mail and the number of volunteers wanting to meet her and help with the Warren's Letters program, which Alexander was now effectively operating in Boston, and Ms. Buffett repeatedly called her friends to express her unhappiness about being permanently relocated to Boston.

25. As Ms. Buffett continued to deteriorate, Alexander began isolating her from SLF and from Mitty, Diane, and Rebecca, who were her closest friends and fellow members of SLF's Board of Directors.

6

26.     Mitty, Diane, and Rebecca worried that the pressure of relocating the Warren's Letters program to Boston would exacerbate Ms. Buffett's mental decline. Alexander explained, however, that administering the program in Boston would help to keep Ms. Buffett "intellectually active," as one of her doctors had recommended a year earlier. Therefore, with great concern for Ms. Buffett's well-being, SLF agreed that if her doctors considered the relocation of the program to Boston to be positive for Ms. Buffett, then SLF would not interfere.

27.     Ms. Buffett continued to deteriorate, and on August 30, 2016, just seven weeks after the article in *The Boston Globe*, she was admitted to McLean Hospital for a psychiatric episode.

28.     On September 1, 2016, Alexander and several other family members sent a letter to Ms. Buffett's friends and associates—including Mitty, Diane, and Rebecca—instructing them to refrain from discussing finances, her residences, or SLF projects with Ms. Buffett. All such communications with Ms. Buffett were to be directed to Alexander, who held her General Power of Attorney and Advance Medical Directive, and who had inserted himself as the gatekeeper between Ms. Buffett and her friends.

29.     At about the same time, in early September 2016, all of the letters received by SLF during the ten years of SLF's operation of the Warren's Letters program (approximately 22,000 letters) were unlawfully removed—without permission from SLF and without notice to SLF—from a locked storage unit in Rockport, Maine and taken to Boston.

**SLF's Discontinued Operation of the Warren's Letters Program**

30.     Given all that had transpired since Alexander's efforts to relocate the Warren's Letters program to Boston, beginning with the article in *The Boston Globe* and culminating in Ms. Buffett's hospitalization and Alexander's removal of the letters from the locked storage unit

in Maine, Mitty, Diane, and Rebecca decided to discontinue SLF's operation of the Warren's Letters program, in part because they could not be responsible fiduciaries for a program over which they no longer had any control or input, and in part because they continued to be worried about the program's impact on Ms. Buffett's decline.

31. Given their concern for Ms. Buffett's well-being, Mitty, Diane, and Rebecca decided to leave the future of the Warren's Letters program in Warren Buffett's hands. As Mitty explained in an email to Mr. Buffett on September 7, 2017:

> I'm emailing you to inform you that the majority of the Sunshine Lady Foundation board members, in consultation with our legal advisor, have made the difficult decision to discontinue the Sunshine Lady "Warren's letters" program for reasons given below. This decision was made after a cascade of events beginning with the Boston Globe article on August 13th, followed by Doris' hospitalization on August 29th, and finally the receipt of a letter sent from Doris' family via her lawyer on Sept 1st, asking friends and associates to refrain from appealing directly to her to influence decisions about her residence, travel schedule, foundation projects, and finances…. We feel it is only right that you should make the decision about how to proceed with the "Warren's letters" program going forward. Given our grave concern about Doris' health, and the fact that we are not privy to the nature or extent of her health crisis, we do not feel it is within our purview, as friends, employees or SLF board members, to make a recommendation as to next steps. We are confident that your involvement at this juncture will give Doris peace of mind. Alexander will contact you directly to present his plan for how to proceed.

32. Mitty, Diane, and Rebecca's request to Warren Buffett to decide the future of the Warren's Letters program—a request that had nothing to do with Alexander, but instead was based on their concern for Ms. Buffett's well-being—deeply angered Alexander, who wanted to operate and control the program in Boston and therefore unilaterally took the matter into his own hands.

33. The very next day, September 8, 2016, Alexander signed the Eleventh and Twelfth Amendments of the Trust. In the Eleventh Amendment, Alexander removed Mitty as a named successor trustee of the Trust, making himself the sole successor trustee. In the Twelfth

8

Amendment, Alexander reduced SLF's beneficial interest in the Trust and named a charitable foundation to be created by him in Boston as the primary beneficiary after Ms. Buffett's death. Ms. Buffett did not sign either amendment. On information and belief, Ms. Buffett was not aware of the Eleventh and Twelfth Amendments of the Trust, was not aware that Mitty was being removed as a named successor trustee and that SLF's beneficial interest was being reduced, and was not competent to sign these amendments for herself.

34. On September 21, 2016, SLF held a pre-planned special meeting of its Board of Directors to vote to discontinue SLF's operation of the Warren's Letters program. Alexander attended the special meeting and abstained from voting, and Ms. Buffett did not attend.

35. Thereafter, Alexander used SLF's discontinuation of its operation of the Warren's Letters program as a reason to attack SLF on Ms. Buffett's behalf, and to drive a wedge between Ms. Buffett and SLF. On information and belief, Alexander manufactured this dispute with SLF in order to justify his self-interested amendments to the Trust on September 8, 2016, and in order to justify his diversion of the beneficial interest in the Trust from SLF to the new charitable foundation in Boston that he was creating.

36. On September 16, 2016, Alexander created his new charitable foundation—called The Sunshine Lady Humanitarian Grants Program, Inc.—by filing Articles of Organization with the Secretary of the Commonwealth of Massachusetts. The Articles of Organization, which were prepared by Alexander's lawyers in Boston, listed Alexander as the President and a Director. Ms. Buffett was not listed in the filing.

37. By letter dated October 13, 2016, SLF was informed by Thacher Associates, which identified itself as "an advisor for Doris Buffett's family," that it would be conducting a forensic accounting of SLF's records due to SLF's "closing" the Warren's Letters program.

38. By letter dated October 21, 2016, the Boston law firm that was representing Alexander and his charitable foundation, and purportedly Ms. Buffett as well (Alexander was now in full control of Ms. Buffett's legal affairs—she no longer had her own independent legal counsel), informed SLF that Alexander and Ms. Buffett had engaged the Boston law firm to "assist them with charitable and personal matters" and demanded SLF's compliance with the "in-depth investigatory audit of the Foundation" that Alexander and Ms. Buffett had ordered. In truth, on information and belief, Ms. Buffett was not involved in making this decision.

39. On information and belief, the Boston law firm representing Alexander, his charitable foundation, and purportedly Ms. Buffett had also prepared the Eleventh and Twelfth Amendments of the Trust, which Alexander signed and under which Mitty was removed as a named successor trustee of the Trust, making Alexander the sole successor trustee, and SLF's beneficial interest in the Trust was effectively diverted to Alexander's charitable foundation.

40. On October 24, 2016, SLF's Board of Directors voted unanimously to appoint a nationally recognized auditor, RSM US LLC ("RSM"), to complete its own audit of SLF. Alexander insisted, however, that in addition to RSM's audit, he would still pursue the forensic accounting of SLF through Thacher Associates.

41. By letter dated November 23, 2016, the Boston law firm representing Alexander, his charitable foundation, and purportedly Ms. Buffett wrote that their decision to seek a forensic accounting of SLF "arose from their concern about financial controls at the Foundation and the possibility of self-dealing by other directors, in particular Anne Beal [Mitty] …." In truth, on information and belief, Ms. Buffett did not share this concern, which was later proven by the RSM audit to be unfounded.

10

42. The results of the audit by Thacher Associates were never revealed to SLF's Board of Directors, despite Alexander's previous insistence that he was entitled, as a member of the Board, to order the audit.

43. Meanwhile, Alexander continued to isolate Ms. Buffett from Mitty, Diane, and Rebecca, who had not been permitted to see or speak with Ms. Buffett—their close friend and SLF's President—since her collapse months earlier in August 2016.

44. Ms. Buffett had not participated in any meetings of SLF's Board of Directors during this period of her isolation, prompting Diane to write the following in a letter to Ms. Buffett on February 3, 2017:

> Dear Doris,
>
> First and foremost, I want you to know how extremely painful it has been for Rebecca, Mitty and me to have experienced your absence from our daily lives for the past five months. You are so much more to each of us than the founder and president of the Sunshine Lady Foundation. We all think of you constantly and would like to know how you are and when we can hope to hear from you again.
>
> As acting board president I am compelled to write to you on behalf of the Sunshine Lady Foundation board to inform you that you have missed three consecutive board meetings. In accordance with our Bylaws, Section 3.9 of Section 3: Meetings of Directors, I am now sending you notice advising you that you may be removed from the Board of Directors in the event of a fourth consecutive absence from a meeting. I would have called you, as our bylaws dictate, after you missed two consecutive meetings, but according to the letter we received last September 1st from your family, we were asked to refrain from any contact with you and we have honored that request.
>
> If you feel, given the advice of your medical team, that now is the time to consider retiring as president and director of the foundation, we will of course accept your decision with tremendous sadness in our hearts. An alternative to considering retirement would be the creation of an honorary director status for you which process I will initiate with the board at your request.
>
> I am so sorry that I am now in the position to have to perform this duty.

11

>With great love,
>
>Diane Grimsley
>Board Vice President and Treasurer

45. As of the date of this letter, because Ms. Buffett had been isolated from them, Mitty, Diane, and Rebecca were not aware of the extent of Ms. Buffett's decline, which had been steep, and they were not aware of her incapacity to participate on SLF's Board of Directors or to manage her personal and financial affairs.

46. By letter dated February 14, 2017, the Boston law firm representing Alexander, his charitable foundation, and purportedly Ms. Buffett responded to Diane's letter to Ms. Buffett, mischaracterizing it as a "threat to remove Doris from the Board …."

47. On April 6, 2017, Alexander signed the Sixteenth Amendment of Trust for the purpose of eliminating altogether SLF's beneficial interest in the Trust. Again, on information and belief, Ms. Buffett was not aware of the Sixteenth Amendment eliminating SLF's beneficial interest in the Trust, and she was not competent to sign the amendment for herself.

48. Thereafter, Alexander's isolation of Ms. Buffett from SLF and her friends on SLF's Board of Directors continued, and the tension between Alexander and SLF continued to increase, leading to a Settlement and Release Agreement dated December 11, 2017.

49. The purpose of the Settlement and Release Agreement was to memorialize Ms. Buffett's and Alexander's respective resignations from SLF's Board of Directors, and the transition of the Warren's Letters program from SLF to Alexander's charitable foundation in Boston—The Sunshine Lady Humanitarian Grants Program, Inc.

50. The release language in the Settlement and Release Agreement does not include a release of "future" claims. Although the Boston law firm representing Alexander, his charitable foundation, and purportedly Ms. Buffett had proposed in its initial draft of the agreement that the

12

release would apply to claims that the parties "ever had, now have, or might have in the future," the parties ultimately agreed to delete the phrase "or might have in the future" because the Settlement and Release Agreement was not intended to bar "future" claims.

51. Alexander signed the Settlement and Release on Ms. Buffett's behalf as her attorney-in-fact. Ms. Buffett did not sign for herself. Again, on information and belief, Ms. Buffett was not competent to sign for herself.

## Ms. Buffett's Final Years

52. Mitty, Diane, and Rebecca continued to be blocked from seeing or speaking with their close friend Ms. Buffett during the final years of her life. Whatever news they learned about Ms. Buffett came from others.

53. On May 5, 2018, *The Boston Globe* published a second article by Sacha Pfeiffer. According to this article, Ms. Buffett was suffering from "advanced Alzheimer's disease" since being relocated to Boston in 2015; Ms. Buffett has "severe dementia" and, according to a caretaker, it would be "hard for her to put a sentence together now[;]" her family had limited her visitors, causing close friends to feel "shut out and worried about her welfare[;]" and the new charitable entity created by Alexander—which was funded with Ms. Buffett's wealth, estimated at $50 million in Berkshire Hathaway stock in September 2016—was spending lavishly on "everything from six-figure salaries to $200-an-hour 'leadership coaches' in the name of a woman known for her Midwestern thrift."

54. The May 2018 article in *The Boston Globe* further reported that Mitty continued to be "a co-trustee, with [Alexander] Rozek, of Ms. Buffett's will [the Trust]." As of the date of the article, on information and belief, SLF continued to be the primary beneficiary of the Trust after Ms. Buffett's death. Indeed, Mitty was never informed that she had been removed as a

13

successor trustee of the Trust, and SLF was never informed that it had been removed as the primary beneficiary of the Trust after Ms. Buffett's death.

55. Ms. Buffett passed away on August 4, 2020.

56. Following Ms. Buffett's death, in response to SLF's inquiry, the Boston law firm that had represented Alexander, his charitable foundation, and purportedly Ms. Buffett informed SLF that it was not a beneficiary of the Trust and that Mitty was not a successor trustee of the Trust.

57. SLF's request for further information—including copies of the trust documents and the date when SLF was purportedly removed as a beneficiary of the Trust and Mitty was purportedly removed as a successor trustee—was refused. Instead, the individual "non-family" members of SLF's Board of Directors were threatened with claims of personal liability and damages if SLF were to pursue its interest in the Trust.

58. Moreover, despite the fact that Ms. Buffett's Last Will and Testament names Mitty as a co-personal representative of Ms. Buffett's probate estate, Mitty was threatened with litigation if she were to seek her appointment as a co-personal representative and "attempt to pry into the private affairs of Ms. Buffett's family." Alexander insisted on being appointed as the sole personal representative of Ms. Buffett's probate estate, even though that is not what Ms. Buffett had wanted.

59. Ms. Buffett wanted to ensure the continuation of her charitable work through SLF after her death. To that end, she named SLF as the primary beneficiary of the Trust after her death, and she named Mitty to serve as a successor trustee of the Trust and co-personal representative of her estate to oversee their proper administration. Ms. Buffett confirmed this intention as recently as January 15, 2016, when she herself signed the Tenth Amendment of the

14

Trust and the Codicil to her Last Will and Testament. On information and belief, these were the last estate-planning documents that Ms. Buffett would ever sign, and the last estate-planning documents that were prepared for Ms. Buffett by her own independent legal counsel.

60. On information and belief, Alexander's charitable foundation—the foundation to which Alexander had diverted SLF's beneficial interest in the Trust through his purported amendments of the Trust—ceased operations on December 31, 2020, less than five months after Ms. Buffett's death.

## COUNT I
### (Lack of Testamentary Capacity)

61. SLF re-alleges and incorporates herein all of the preceding paragraphs.

62. Ms. Buffett lacked testamentary capacity to execute the Eleventh and Twelfth Amendments of the Trust on September 8, 2016, purportedly removing Mitty as a named successor trustee of the Trust and reducing SLF's beneficial interest in the Trust.

63. On information and belief, Alexander signed the Eleventh and Twelfth Amendments of the Trust because Ms. Buffett lacked testamentary capacity to sign for herself. Alexander's signing of the Eleventh and Twelfth Amendments is an acknowledgement that Ms. Buffett lacked testamentary capacity to sign for herself. On further information and belief, Ms. Buffett was not even aware of—and would not have approved of—the Eleventh and Twelfth Amendments purportedly removing Mitty as a named successor trustee of the Trust and reducing SLF's beneficial interest in the Trust.

64. Ms. Buffett lacked testamentary capacity to execute the Sixteenth Amendment of the Trust on April 6, 2017, purportedly eliminating SLF's beneficial interest in the Trust.

65. On information and belief, Alexander signed the Sixteenth Amendment of the Trust because Ms. Buffett lacked testamentary capacity to sign for herself. Alexander's signing

of the Sixteenth Amendment is an acknowledgement that Ms. Buffett lacked capacity to sign for herself. On further information and belief, Ms. Buffett was not even aware of—and would not have approved of—the Sixteenth Amendment purportedly eliminating SLF's beneficial interest in the Trust.

66. Because Ms. Buffett was suffering from advanced dementia at the time of the Eleventh, Twelfth, and Sixteenth Amendments of the Trust, the burden is on Alexander to prove that Ms. Buffett possessed the required testamentary capacity.

67. As a result of Ms. Buffett's lack of testamentary capacity, the Eleventh, Twelfth, and Sixteenth Amendments of the Trust—and any other undisclosed amendment that purports to reduce or eliminate SLF's interest and rights in the Trust—are invalid.

## COUNT II
### (Undue Influence)

68. SLF re-alleges and incorporates herein all of the preceding paragraphs.

69. The Eleventh, Twelfth, and Sixteenth Amendments of the Trust are invalid because they are the product of Alexander's undue influence.

70. The Eleventh, Twelfth, and Sixteenth Amendments of the Trust provide for an unnatural disposition of Ms. Buffett's assets by diverting them after Ms. Buffett's death from SLF to Alexander's charitable foundation. Ms. Buffett clearly and repeatedly expressed her intent, including in the trust documents that she herself signed, that whatever assets remained upon her death would go to SLF to continue her charitable work after her death through SLF.

71. Ms. Buffett was susceptible to undue influence when the Eleventh, Twelfth, and Sixteenth Amendments of the Trust were signed. She was suffering from advanced dementia, so much so that she was not competent to sign these trust amendments for herself.

72. Alexander had an opportunity to exert undue influence on Ms. Buffett until her death on August 4, 2020. Throughout this entire period, he continued to isolate her from her from Mitty, Diane, and Rebecca—her good friends at SLF—and took control of her financial, medical, and legal decisions as her fiduciary under the General Power of Attorney.

73. Alexander used this opportunity to procure the Eleventh, Twelfth, and Sixteenth Amendments of the Trust through improper means. He himself signed the Eleventh, Twelfth, and Sixteenth Amendments of the Trust, purportedly on Ms. Buffett's behalf as her fiduciary under the General Power of Attorney. Ms. Buffett did not sign these trust amendments for herself. On information and belief, she was not even aware of them.

74. The Eleventh, Twelfth, and Sixteenth Amendments of the Trust were not prepared by Ms. Buffett's own independent legal counsel. She did not have her own independent legal counsel to protect her interests. On information and belief, these amendments were prepared by Alexander's counsel and his charitable foundation's counsel.

75. Alexander benefitted directly or indirectly from the Eleventh, Twelfth, and Sixteenth Amendments of the Trust. Therefore, as Ms. Buffett's fiduciary, he bears the burden of proving that these amendments were advantageous to Ms. Buffett, and were made with her full knowledge and intent and with the advice of independent legal counsel.

76. As a result of Alexander's undue influence, the Eleventh, Twelfth, and Sixteenth Amendments of the Trust—and any other amendment that purports to reduce or eliminate SLF's interest and rights in the Trust—are invalid.

## COUNT III
**(Interference with Expectancy)**

77. SLF re-alleges and incorporates herein all of the preceding paragraphs.

17

78. Pursuant to the Trust and its amendments that were signed by Ms. Buffett herself, SLF had a legally protected expectancy in her assets that remained upon her death, which she intended to leave to SLF to continue her charitable work after her death through SLF.

79. As alleged above, Alexander, in his individual capacity, unlawfully interfered with SLF's expectancy through undue influence and by improperly procuring or making amendments of the Trust that purportedly reduced and then eliminated SLF's beneficial interest and rights in the Trust.

80. Alexander's interference with SLF's expectancy acted continuously until Ms. Buffett's death on August 4, 2020, which is when SLF's expectancy would have been realized under the terms of the Trust.

81. As a result of Alexander's interference with SLF's expectancy, SLF has been damaged in an amount to be determined at trial, plus interest and costs.

### COUNT IV
**(Declaratory Judgment)**

82. SLF re-alleges and incorporates herein all of the preceding paragraphs.

83. Actual controversies exist as to the validity of certain amendments of the Trust and SLF's interest and rights as a beneficiary of the Trust. These controversies are appropriate for declaratory relief pursuant to M.G.L. c. 231A, § 1.

84. More specifically, actual controversies exist as to whether amendments of the Trust purportedly reducing and then eliminating SLF's interest and rights as a beneficiary of the Trust are invalid because Ms. Buffett lacked testamentary capacity, because the amendments were the result of undue influence, or because the amendments were the result of Alexander's tortious interference with SLF's expectancy, as alleged above.

Case 1:20-cv-12446-LTS  Document 36  Filed 06/01/21  Page 18 of 20

85. Moreover, an actual controversy exists as to whether Alexander possessed the power or authority to amend the Trust as Ms. Buffett's fiduciary under the General Power of Attorney and the terms of the Trust, as required.

86. SLF seeks a declaration that the amendments of the Trust reducing and then eliminating SLF's beneficial interest and rights in the Trust are invalid, and that SLF is a beneficiary of the Trust with all rights attendant to its beneficial interest pursuant to the terms of the Trust.

## PRAYER FOR RELIEF

WHEREFORE, The Sunshine Lady Foundation, Inc. respectfully prays that the Court:

A. Enter a judgment for SLF on Count I for lack of testamentary capacity, ordering that the amendments of the Trust are invalid because Ms. Buffett lacked testamentary capacity;

B. Enter a judgment for SLF on Count II for undue influence, ordering that the amendments of the Trust are invalid because they are the result of undue influence;

C. Enter a judgment for SLF on Count III for interference with expectancy, awarding damages against Alexander individually in an amount to be determined at trial, plus interest and costs;

D. Issue a declaration in favor of SLF as requested in Count IV; and

E. Grant such other and further relief for SLF as is deemed just and appropriate under the circumstances.

## JURY DEMAND

SLF respectfully requests a trial by jury on all claims so triable.

THE SUNSHINE LADY FOUNDATION, INC.

By its counsel,


/s/ Mark E. Swirbalus
Mark E. Swirbalus (BBO No. 631650)
Rebecca Harris (BBO No. 699598)
GOULSTON & STORRS PC
400 Atlantic Avenue
Boston, Massachusetts 02110
(617) 482-1776
mswirbalus@goulstonstorrs.com
rharris@goulstonstorrs.com

Dated: January 25, 2021